United States Courts
Southern District of Texas
FILED
*April 14, 2023*
Nathan Ochsner, Clerk of Court

# 𝕌nited 𝕊tates 𝕮ourt of 𝔄ppeals
# for the 𝔽ifth 𝕮ircuit

United States Court of Appeals
Fifth Circuit
**FILED**
April 14, 2023
Lyle W. Cayce
Clerk

No. 21-20337

---

JOHN ALLEN, JR.; LAWTON ALLEN, JR.;
ESTATE OF JOHN ALLEN, SR.; MR. SHERMAN ALLEN;
MARTHA VAUGHN,

*Plaintiffs—Appellants,*

*versus*

JUSTIN HAYS; CITY OF HOUSTON; TYLER SALINA; M. ARROYO;
DIEGO MORELLI,

*Defendants—Appellees.*

---

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:18-CV-171

---

ON PETITION FOR REHEARING

Before SMITH, BARKSDALE, and HAYNES, *Circuit Judges.*
PER CURIAM:

IT IS ORDERED that the petition for rehearing is DENIED. The opinion issued on March 21, 2023, is WITHDRAWN, and the following opinion is substituted:

No. 21-20337

Before SMITH, BARKSDALE, and HAYNES, *Circuit Judges*.
JERRY E. SMITH, *Circuit Judge*:

During a routine traffic stop, Houston Police Officer Justin Hayes fatally shot John Allen, Jr. Plaintiffs brought over a dozen claims against Hayes, two other involved police officers, and the city. The individual defendants claim the benefit of qualified immunity. After years of litigation, the district court, in ruling on a motion to dismiss in response to plaintiffs' complaint, dismissed the claims *in toto*. Plaintiffs appeal the dismissal and request reassignment to a different district judge.

We agree with plaintiffs that dismissal of the § 1983 claims against Hayes for excessive force, denial of medical care, and unlawful arrest was error. We reverse and remand those claims. The dismissal of plaintiffs' remaining claims is affirmed. We deny, as moot, plaintiffs' request for reassignment to a new judge.

## I.

On November 4, 2015, John Allen, Sr., was driving through Houston with friend Shannell Arterberry in the passenger seat of a pickup.[1] Allen was a 58-year-old veteran known to the Houston Police Department ("HPD") for his documented history of PTSD. He had twice struggled to comply with orders from Houston police, but officers had resolved both non-violent incidents with de-escalation tactics and follow-up mental health checks.

Late that night, Officers Justin Hayes and Tyler Salina stopped Allen for a routine traffic stop.[2] After Allen pulled the truck over, the officers

---

[1] Unless otherwise noted, all facts are taken from the plaintiffs' third amended complaint.

[2] Hayes's name has occasionally been spelled as "Hays." At oral argument, counsel confirmed that the proper spelling is "Hayes." We thus adopt that spelling.

approached the passenger's and driver's sides of Allen's vehicle with pointed guns. Salina went to the driver's side and asked Allen to roll the window down, but the window did not function. Salina heard Allen state that he was going to reach for his wallet. On the passenger side, Hayes instructed Allen to stop moving, to stop reaching, and to remove his foot from the gas pedal. Hayes had a taser in his pocket but did not use it. Instead, within seconds and without further warning, Hayes leaned across Arterberry and fired six shots, hitting Allen five times at point-blank range.

After being shot, Allen fell onto the gas pedal, and his truck slammed into a nearby tree. Hayes radioed for backup and commanded Arterberry out of the truck and onto the street, where he handcuffed her and put her into the back of the police car. Several minutes later, Officers Diego Morelli, Jeffrey Sneed, Jason Zimmerman, Jose Lopez, Alton Baker, Matthew Hurbin, and Shirley Ellis arrived. The officers broke the driver's side window with an officer's rifle butt and dragged the injured Allen onto the street.

Once Allen was on the ground, Hayes handcuffed him. At no point did any officer attempt to use any life-saving procedures on Allen. Emergency Medical Services was not called until six minutes after the shooting, only after Hayes had radioed for backup and the dispatching officer had checked the license plate. Handcuffed on the ground, Allen died at the scene.

Seven officers searched the scene and found no weapons in the car or in Allen's pockets.[3] Twenty-two days later, however, Mandy Arroyo, an

---

[3] In reviewing a motion to dismiss, we consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which the judge may take judicial notice." 2 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 12.34[2], at 12-94 (3d ed. 2022). Throughout their brief, appellees make several references to various videos, such as videos of the officers' body-cam footage and a video that allegedly confirms a pistol found in "the passenger compartment" of Allen's trunk. Assuming *arguendo* that the body-cam footage was incor-

No. 21-20337

Internal Affairs Division investigator for HPD, reported that his investigation of the truck turned up a gun in plain sight on the back seat. The city awarded Hayes an award for the incident involving Allen and promoted him to sergeant.

## II.

The instant appeal is this case's second trip to this court. Plaintiffs' case was removed to federal district court in January 2018, and the district court dismissed all their claims in August of that year. Plaintiffs appealed, contending that the district court had improperly weighed the evidence in rendering its decision on defendants' motion to dismiss, and the panel agreed; we reversed and remanded the judgments dismissing the claims against Hayes and the city. *Allen v. Hays*, 812 F. App'x 185 (5th Cir. 2020).

Upon return to the district court, plaintiffs filed their third amended complaint (the "live complaint"). That complaint alleged approximately twenty-three claims against Hayes, the City of Houston, and Officers Morelli and Arroyo. Again, defendants moved to dismiss per Federal Rule of Civil Procedure 12(b)(6), and the district court dismissed all claims. This appeal timely followed.

---

porated into plaintiffs' live complaint such that we can consider it at the motion-to-dismiss stage, which is far from clear, nothing in it clearly contradicts plaintiffs' version of events. *Cf. Scott v. Harris*, 550 U.S. 372, 378–79 (2007) (considering a videotape that "quite clearly contradict[ed]" the non-movant's version of events in reviewing a denial of summary judgment). To the extent that any other photos and videos are in the record before us, none can be considered at the motion-to-dismiss stage because they were neither referenced in plaintiffs' live complaint nor central to it, nor can we take judicial notice of them.

No. 21-20337

III.

We review *de novo* the grant of a Rule 12(b)(6) motion to dismiss. *Lampton v. Diaz*, 639 F.3d 223, 225 (5th Cir. 2011). To survive a motion to dismiss, the complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

At this stage, "[w]e accept all well-pled facts as true, construing all reasonable inferences in the complaint in the light most favorable to the plaintiff." *White v. U.S. Corrections, L.L.C.*, 996 F.3d 302, 306–07 (5th Cir. 2021) (citing *Heinze v. Tesco Corp.*, 971 F.3d 475, 479 (5th Cir. 2020)). "Conclusory allegations, unwarranted factual inferences, or legal conclusions" are not accepted as true. *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005) (citing *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004)).

When a plaintiff pleads a § 1983 claim that implicates qualified immunity, the complaint "must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity." *Arnold v. Williams*, 979 F.3d 262, 267 (5th Cir. 2020) (quoting *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012)). The standard is not heightened: "[A] plaintiff must plead qualified-immunity facts with the minimal specificity that would satisfy *Twombly* and *Iqbal*." *Id.* Therefore, "[i]n determining immunity, we accept the allegations of [plaintiff]'s complaint as true." *Lampton*, 639 F.3d at 225 (quoting *Kalina v. Fletcher*, 522 U.S. 118, 122 (1997)).

Qualified immunity shields government officials from liability if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*,

No. 21-20337

457 U.S. 800, 818 (1982).  The Supreme Court has laid out a two-part test to determine whether a defendant is entitled to qualified immunity:  The plaintiff must show first, "whether the facts that a plaintiff has alleged . . . make out a violation of a . . . right" and second, "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (quoting *Saucier v. Katz*, 553 U.S. 194, 201 (2001)).

## IV.

Plaintiffs bring § 1983 claims against Hayes for unlawful arrest and detention, excessive force, denial of medical care, and racial discrimination. We reverse and remand the dismissal of the claims of excessive force, unlawful arrest and detention, and denial of medical care.  We affirm the dismissal of the race-discrimination claim.

*Excessive Force*

Plaintiffs claim that Hayes's shooting of Allen was an excessive use of force that violated Allen's constitutional right to be free from unreasonable search and seizure.

To satisfy the first step of the above-discussed two-part test for qualified immunity, Allen must show that he "suffer[ed] an injury that result[ed] directly and only from a clearly excessive and objectively unreasonable use of force."  *Cloud v. Stone*, 993 F.3d 379, 384 (5th Cir. 2021) (citing *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020)).  This is an objective standard.  The use of force is not excessive and unreasonable if "the officer['s] actions are objectively reasonable in light of the facts and circumstances confronting [him], without regard to their underlying intent or motivation."  *Id.* (quoting *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir.

No. 21-20337

2012) (alterations in original)). Many factors are relevant: "[W]ith 'careful attention to the facts and circumstances of each particular case,' courts consider 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Courts will consider "not only the need for force, but also the relationship between the need and the amount of force used." *Id.* (quoting *Joseph*, 981 F.3d at 332). And the reasonableness is "judged from the perspective of a reasonable officer on the scene," instead of the "20/20 vision of hindsight." *Id.* (quoting *Graham*, 490 U.S. at 396).

It follows that it is manifestly unreasonable for an officer to seize a suspect the officer knows is unarmed and not aggressive by shooting him dead. *Poole v. City of Shreveport*, 13 F.4th 420, 424 (5th Cir. 2021); *see also Waller v. Hanlon*, 922 F.3d 590, 599 (5th Cir. 2019). But if the officer believes the suspect has a gun, the calculation changes—even if there was never, in fact, a gun. This circuit has often found "an officer's use of deadly force to be reasonable when a suspect moves out of the officer's line of sight such that the officer could reasonably believe the suspect was reaching for a weapon." *Manis v. Lawson*, 585 F.3d 839, 844 (5th Cir. 2009).[4] Nevertheless, an officer cannot escape liability any time he claims he saw a gun. The question is whether the officer's belief that he saw a gun was sufficiently reasonable to justify the use of deadly force in light of all the surrounding circumstances.

For example, many of our cases involve other factors that led the officer to suspect that the victim would resort to violence.[5] Further, "[e]ven

---

[4] *See also Ontiveros v. City of Rosenberg*, 564 F.3d 379, 385 (5th Cir. 2009); *Reese v. Anderson*, 926 F.2d 494, 501 (5th Cir. 1991).

[5] *See, e.g., Batyukova v. Doege*, 994 F.3d 717, 722–23 (5th Cir. 2021) (suspect refused to comply with demands, gave officers the middle finger, and yelled "f**k you," "f**k

when a suspect is armed, a warning must be given, when feasible, before the use of deadly force." *Poole*, 13 F.4th at 425. And the use of force should be proportional to the threat. *See Brothers v. Zoss*, 837 F.3d 513, 519 (5th Cir. 2016). Thus, if the officer could reasonably use less than deadly force, he must.

The majority of these factors cut against Hayes. Plaintiffs have alleged that Allen was not carrying a gun (nor was there a gun in the car), that a reasonable officer would have known there was no gun, and that Allen never reached outside the officer's line of sight. Hayes had a taser he could have used instead of a gun, but he did not. Hayes never warned Allen that he would shoot. Taking these allegations as true, plaintiffs have pleaded sufficient facts plausibly to allege that Hayes's decision to shoot Allen was an excessive use of force.

To survive the motion to dismiss, however, as the second step of overcoming a qualified-immunity defense, plaintiffs must also plead enough to allege that the constitutional violation was clearly established at the time of the shooting. *Waller*, 922 F.3d at 599. "Qualified immunity shields from civil liability 'all but the plainly incompetent or those who knowingly violate the law.'" *Manis*, 585 F.3d at 845 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). To survive the motion to dismiss, "plaintiff[s] must plead 'facts which, if proved, would defeat [the] claim of immunity.'" *Waller*, 922 F.3d at 599(quoting *Westfall v. Luna*, 903 F.3d 534, 542 (5th Cir. 2018) (second alter-

---

America," and, allegedly, "you're going to f**king die tonight"); *Manis*, 585 F.3d at 842 (suspect ignored officers' orders and "began shouting obscenities and flailing his arms aggressively at them"); *Ontiveros*, 564 F.3d at 381 (police officers were warned that suspects were "high risk because [they] had been involved in a violent altercation earlier in the day, may have been drinking, possessed and threatened to use a pistol and a rifle, and were believed capable of using the weapons").

No. 21-20337

ation in original)).

It was well established, at the time of the shooting, that such use of deadly force against a person who the officer knows is not dangerous is a constitutional violation.[6]   Plaintiffs have plausibly alleged that Hayes knew Allen was unarmed and not aggressive.  Their claim of excessive force thus survives the motion to dismiss.

*False Arrest*

Plaintiffs bring two claims of unlawful arrest and detention against Hayes.  They first claim that Hayes unlawfully detained Allen when he pulled Allen over without reasonable suspicion.  Their second claim is that Hayes unlawfully arrested Allen when he handcuffed him without probable cause.

The first allegation is that the initial traffic stop was an unlawful seizure.  The Fifth Circuit analyzes the legality of traffic stops under the *Terry* standard, "a two-tiered reasonable suspicion inquiry: 1) whether the officer's action was justified at its inception, and 2) whether the search or seizure was reasonably related in scope to the circumstances that justified the stop in the first place."  *United States v. Valadez*, 267 F.3d 395, 397–98 (5th Cir. 2001) (citing, *inter alia*, *Terry v. Ohio*, 392 U.S. 1, 19–20 (1968)).  Then, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."  *Id.* (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)).  Under this standard, if Hayes thought Allen was committing a traffic violation, then the first prong of *Terry* would be satisfied.

---

[6] *See, e.g.*, *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 488 (5th Cir. 2001) ("[D]eadly force violates the Fourth Amendment *unless* 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).

No. 21-20337

Plaintiffs' complaint is inconsistent regarding whether Hayes suspected a traffic violation. Plaintiffs' opening brief suggests that the police officers pulled Allen over for a broken tail light and running a stop sign. Later, in their reply brief, they claim that Allen had not committed any traffic violations. Even so, an argument cannot be raised for the first time in a reply brief, so it is waived.[7] Without a specific allegation that the traffic stop was without grounds, the claim of illegal detention is conclusory. The claim's dismissal is thus affirmed.

Plaintiffs' allegation of unlawful arrest fares better. An arrest is unlawful if the officer did not have probable cause. *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 206–07 (5th Cir. 2009). A seizure is an arrest if "a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *Turner v. Lieutenant Driver*, 848 F.3d 678, 692–93 (5th Cir. 2017) (quoting *Carroll v. Ellington*, 800 F.3d 154, 170 (5th Cir. 2015)). But "[u]sing some force on a suspect, pointing a weapon at a suspect, ordering a suspect to lie on the ground, and handcuffing a suspect . . . do not automatically convert an investigatory detention into an arrest requiring probable cause." *Id.* (quoting *United States v. Sanders*, 994 F.2d 200, 206 (5th Cir. 1993)). To determine whether an investigatory detention has risen to the level of an arrest, "[t]he court must determine case by case whether the police were unreasonable in failing to use less intrusive procedures to conduct their investigation safely." *Sanders*, 994 F.2d at 206–07.

Plaintiffs allege it was an illegal seizure for Hayes to handcuff Allen after he had been shot six times, crashed into a tree, pulled out of his truck,

---

[7] Exceptions to this rule are not applicable here.

No. 21-20337

and put onto the ground.[8]  The district court held that Allen "was handcuffed after disobeying Hayes's repeated instructions and driving away into a tree— which is unquestionably probable cause." But accepting the facts as pleaded by plaintiffs, Allen never disobeyed Hayes's instructions, and driving into the tree was caused by "an involuntary reflex" that occurred "[f]ollowing the impact from the gunshots." The district court thus construed the facts in favor of the defendants, which is error. Regardless, we analyze *de novo*.

If Hayes reasonably thought he saw a gun, then it would have been reasonable to handcuff Allen and not necessarily an arrest. *See Sanders*, 994 F.2d at 206–07. Conversely, if Hayes did not have reason to believe there was a gun, failing to use less intrusive procedures than handcuffs to detain Allen likely constituted an arrest without probable cause, especially given Allen's injuries. *See id.* Plaintiffs have alleged that nothing supports the contention that Hayes was reasonable in believing he saw a gun: There was never a gun in Allen's pocket, Salina had instructed Allen to pull out his wallet, and nothing else in the surrounding circumstances led Hayes to believe Allen had a gun. In the motion to dismiss stage, this is sufficient to allege that Hayes's handcuffing of the injured Allen was an arrest (*see Sanders*) without probable cause (*see Turner*).

But to survive the motion to dismiss, plaintiffs must also show that Hayes's actions clearly violated the Constitution. *Sanders* and *Carroll* were decided before Hayes's actions. The question is therefore whether they laid out the law with such particularity that Hayes would have known his actions

---

[8] The complaint fluctuates between stating that it was Hayes or Morelli who handcuffed Allen. But when reviewing a motion to dismiss, we view facts "in the light most favorable to the plaintiffs." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (quotation omitted). For the purposes of this motion, we therefore assume Hayes had at least some involvement in the handcuffing.

No. 21-20337

were unconstitutional. *See Manis*, 585 F.3d at 845–46. Again, we construe all pleadings in favor of the plaintiffs. Taking as true that Hayes had no reason to believe Allen was armed and that Hayes knew Allen was seriously injured and likely could not move, a police officer would know, under these precedents, that to handcuff Allen was an arrest without probable cause under clearly established law. Accordingly, we vacate and remand the dismissal of that claim.

*Denial of Medical Care*

Plaintiffs allege that Allen "was bleeding, moaning, groaning from pain, and in obvious and critical need of emergency medical care and treatment," but Hayes "did not provide life-saving measures or timely summon medical care or permit medical personnel to treat Mr. Allen." They contend that this denial of medical care was a constitutional violation.

The Fourteenth Amendment "right of a pretrial detainee to medical care . . . . is violated if an officer acts with deliberate indifference to a substantial risk of serious medical harm and resulting injuries." *Mace v. City of Palestine*, 333 F.3d 621, 625 (5th Cir. 2003) (citing *Wagner v. Bay City*, 227 F.3d 316, 324 (5th Cir. 2000)). Though *Mace* held that "[t]he officer must have the subjective intent to cause harm," *id.* at 626, subsequent Fifth Circuit decisions have refined *Mace* based on earlier cases and have rejected the subjective-intent requirement, generally requiring plaintiff to show only that defendants "were [1] aware of facts from which an inference of a substantial risk of serious harm to an individual could be drawn" and "[2] that they actually drew the inference." *Garza v. City of Donna*, 922 F.3d 626, 634 (5th Cir. 2019) (citing *Sanchez v. Young Cnty.*, 866 F.3d 274, 280 (5th Cir. 2017)); *see also Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020). Even under that standard, however, deliberate indifference remains "an extremely high standard to meet." *Dyer*, 964 F.3d at 380 (quoting *Domino v. Tex. Dep't of Crim.*

No. 21-20337

*Just.*, 239 F.3d 752, 755 (5th Cir. 2001)).[9]

Plaintiffs therefore need to allege sufficient facts to show that (1) Hayes was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and (2) he drew that inference. They have. Plaintiffs alleged that after Allen was shot five times at point-blank range and crashed into a tree, Hayes waited six minutes after the shooting to call for medical care, dragged Allen out of the truck, handcuffed him on the ground, and never attempted to provide CPR, oxygen, chest compressions, or any other life-saving measures.

The most on-point factual comparator is *Cope v. Cogdill*, 3 F.4th 198 (5th Cir. 2021), *cert denied*, 142 S.Ct. 2573 (2022). A jailer "watch[ed] an inmate attempt suicide and fail[ed] to call for emergency medical assistance." *Id.* at 209. Instead, the jailer called his supervisor, who arrived at the jail approximately 10 minutes after receiving the jailer's call and then called 911. *Id.* at 203, 209. The court held that even though the jailer immediately called his supervisor, he should have known to call emergency assistance. The court stated, "[W]e now make clear that promptly failing to call for emergency assistance when a detainee faces a known, serious medical emergency . . . constitutes unconstitutional conduct." *Id.* at 209.

There are differences between that case and ours. First, Hayes was not a jailer but a police officer on duty. Second, unlike the jailer, Hayes eventually did call 911, albeit six minutes later. Those differences, however, are not distinct enough to render Hayes's actions so different from the *Cope* defendant's unconstitutional conduct. Hayes knew that he had shot Allen

---

[9] The district court relied on the older formulation and dismissed Allen's claim "[b]ecause Allen has not pleaded Hayes['s] . . . subjective intent during the incident." That is error.

No. 21-20337

five times. He called for backup but waited six minutes before calling for medical aid. The risk would have been apparent.

Plaintiffs must also show that the constitutional violation was clearly established at the time of Hayes's actions. *Cope* was decided after Hayes pulled Allen over and could not establish the law for Hayes. The *Cope* court, in a summary judgment posture, held that "[e]xisting case law . . . was not so clearly on point as to 'place[] the statutory or constitutional question beyond debate.'" *Id.* (citing *Morgan v. Swanson*, 659 F.3d 359, 372 (5th Cir. 2011) (en banc)). "Until today, we have not spoken directly on whether failing to call for emergency assistance in response to a serious threat to an inmate's life constitutes deliberate indifference." *Id.* Still, the *Cope* court noted that *Dyer* had previously held "existing precedent showed that officers who, 'despite being aware of the detainee's dire condition[,] . . . did nothing to secure medical help' at all were on 'fair warning' that their behavior was deliberately indifferent." *Id.* (quoting *Dyer*, 964 F.3d at 384–85) (omission in original). Hayes's conduct was significantly more severe than that of the *Cope* defendant—unlike in *Cope*, where the jailer did not necessarily know the extent of the victim's injuries, Hayes knew he had shot Allen.

Plaintiffs have therefore pleaded sufficient facts to make it at least plausible that Hayes's actions were a violation of clearly established law. As alleged, Hayes stood by for six minutes without performing any medical care or calling for medical backup, aware that he had shot Allen several times and witnessed him crash into a tree, and after he had radioed for police backup for himself. In this posture, that is sufficient to survive a motion to dismiss. The claim is thus vacated and remanded.

*Race Discrimination*

Plaintiffs contend that Hayes pulled Allen over because he was black, thus violating the Equal Protection Clause. To make out an equal protection

14

violation, a party cannot merely prove disparate impact—he must "prove 'the existence of purposeful discrimination' motivating the state action which caused the complained-of injury." *Johnson v. Rodriguez*, 110 F.3d 299, 306 (5th Cir. 1997) (citing, *inter alia*, *McCleskey v. Kemp*, 481 U.S. 279, 292–93 (1987)). Specifically, "[d]iscriminatory purpose in an equal protection context implies that the decisionmaker selected a particular course of action at least in part because of, and not simply in spite of, the adverse impact it would have on an identifiable group." *Woods v. Edwards*, 51 F.3d 577, 580 (5th Cir. 1995) (quoting *United States v. Galloway*, 951 F.2d 64, 65 (5th Cir. 1992)).

Plaintiffs allege nothing regarding Hayes's intent. Their entire allegation is that data in the Houston area tends to show that black drivers are stopped at a higher rate and that a higher rate of searches of black drivers is unwarranted. We agree with the district court that at best, such data shows disparate impact, not discriminatory purpose. The dismissal of that claim is affirmed.

## V.

Plaintiffs also bring a § 1983 claims against the city, for which qualified immunity cannot be claimed. Several of the assertions stem from the officers' conduct on the night Allen was shot, and one is based on fabrication of evidence. We affirm the dismissal of all claims against the city.

The city is a municipality and cannot be held liable under § 1983 "unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691, 694 (1978). A municipality is liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.*

The Fifth Circuit interprets *Monell* as requiring a plaintiff to identify

"(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy (or custom)." *Pineda v. City of Hous.*, 291 F.3d 325, 328 (5th Cir. 2002) (quoting *Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001)).

The first requirement can be shown by "a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by . . . an official to whom the lawmakers have designated policy-making authority" or through a "persistent, widespread practice." *Webster v. City of Hous.*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc) (per curiam). Under the second requirement, a plaintiff must show "[a]ctual or constructive knowledge of [a] custom" that is "attributable to the governing body of the municipality or to an official to whom that body ha[s] delegated policy-making authority." *Id.*; *see also Valle v. City of Hous.*, 613 F.3d 536, 542 (5th Cir. 2010). Finally, a plaintiff must allege "moving force" causation by showing first, "that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Valle*, 613 F.3d at 542 (quoting *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)).

The ratification theory provides another way of holding a city liable under § 1983. Under that theory, a city can also be held liable if the policymaker approves a subordinate's decision and the basis for it, as this "ratification" renders the subordinate's decision a final decision by the policymaker.[10]

---

[10] *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality op.); *but see Okon v. Harris Cnty. Hosp. Dist.*, 426 F. App'x 312, 317–18 (5th Cir. 2011) (holding that a policymaker cannot be held to have ratified an allegedly racist decision if it is not shown that he had actual or constructive knowledge of and approved any alleged racial animus). *Okon* is unpublished and cannot constitute binding law on its own, but we find its reasoning persuasive. *Praprotnik* held that a theory of ratification can suffice for *Monell* liability only

No. 21-20337

*Claims Against the City of Houston for Events on the Night of the Shooting*

Plaintiffs' briefing raises a catalogue of claims against the city. Many are predicated on a failure-to-train contention, a notoriously difficult theory on which to base a *Monell* claim, as it requires plaintiffs to prove that the municipality was aware of an impending rights violation but was deliberately indifferent to it. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) ("Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983."). Plaintiffs must show that "in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *Littell v. Hous. Indep. Sch. Dist.*, 894 F.3d 616, 624 (5th Cir. 2018) (quoting *Canton*, 489 U.S. at 390) (alteration and omission in original). Plaintiffs have not pleaded sufficient facts to clear this high bar.

But plaintiffs also allege a *Monell* violation via the theory of ratification. They claim that, because Hayes was provided a certificate of bravery for his actions during the shooting, it is plausible that the city ratified Hayes's decision to shoot the unarmed Allen. Yet the certificate of bravery alone cannot be the basis for a claim of racial discrimination against the municipality, as plaintiffs have not alleged that the city itself had actual or constructive knowledge of discrimination, nor that the certificate was an approval of

---

if "the authorized policymakers approve a subordinate's decision *and the basis for it*." 485 U.S. at 127 (emphasis added); *see also World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747 (5th Cir. 2009). We thus adopt *Okon*'s observation that a policymaker cannot be liable for racial discrimination unless he ratified a subordinate's decision specifically because of racial animus.

No. 21-20337

racial animus specifically. *See Okon*, 426 F. App'x at 317–18.[11]

Though we lack caselaw on how a municipality might "ratify" the use of excessive force, the same analysis holds true. To succeed on a claim of excessive force via the ratification theory, plaintiffs would need to show that the city granted the certificate of bravery because the force was excessive. In other words, the constitutional violation itself must have been ratified. Even accepting all of plaintiffs' contentions as true—as we must under *Twombly*— there are no allegations that the city was aware of the factors that potentially made Hayes's use of force unreasonably excessive. Without such allegations, plaintiffs cannot make out a showing of liability via ratification. Plaintiffs' ratification claims are thus dismissed.

*Spoliation of Evidence*

Plaintiffs allege that the city "altered and edited videos of the November 4, 2015 shooting for purposes of avoiding liability and accountability," the chain of custody is "questionable," the city withheld evidence, and officers planted the gun that was later found in the car.

To make out this claim, plaintiffs would have to satisfy the *Monell* requirements or establish ratification to overcome the city's municipal immunity. They have done neither. The dismissal of this claim is thus affirmed.

## VI.

Plaintiffs' remaining claims can be quickly disposed of.

*Claims Against Morelli and Arroyo*

All claims against Morelli and Arroyo were properly dismissed as

---

[11] Our holding that the certificate is insufficient proof of the city's intent should not be read as approval of its decision to grant a certificate of bravery for the actions that caused Allen's death.

No. 21-20337

time-barred. Plaintiffs had sought leave to add these defendants to their Second Amended Complaint on August 25, 2020, contending that the statute of limitations was tolled by fraudulent concealment. Before the district court ruled on that motion, plaintiffs filed the live complaint, incorporating Morelli and Arroyo into the pleadings without further reasoning.

Limitations for a suit brought under § 1983 "is determined by the general statute of limitations governing personal injuries in the forum state." *Balle v. Nueces Cnty.*, 952 F.3d 552, 556 (5th Cir. 2017) (quoting *Piotrowski*, 237 F.3d at 576). Limitations for personal injury claims in Texas is two years. *Id.* at 557 (citing TEX. CIV. PRAC. & REM. CODE § 16.003(a)). As plaintiffs did not add Morelli and Arroyo until August 2020 when the shooting occurred in November 2015, the claims are time-barred unless they relate back under Federal Rule of Civil Procedure 15(c)(1). That rule provides two distinct ways a claim that adds a new party can relate back. *Id.* Plaintiffs' claims fail under both.

Rule 15(c)(1)(C) governs relation back where an amended complaint adds a party to an existing suit. It allows relation back where, among other requirements, the party "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." *Id.* This exception has been construed narrowly, generally extending to errors "such as misnomer and misidentification." *Quinn v. Guerrero*, 863 F.3d 353, 363 (5th Cir. 2017). It does not apply in the present situation, where plaintiffs merely declined to sue the parties despite being aware of their existence.[12]

Plaintiffs contend, however, that they satisfy Rule 15(c)(1)(A), which

---

[12] As defendants point out, plaintiffs had a copy of the police report identifying all officers involved in the incident.

No. 21-20337

allows an amended pleading to relate back when "the law that provides the applicable statute of limitations allows relation back." Here, the applicable statute of limitations comes from Texas. But plaintiffs' argument fails even under 15(c)(1)(A) because Texas state law also does not allow relation back in this context.

Plaintiffs attempt to use *Univ. of Tex. Health Sci. Ctr. at San Antonio v. Bailey*, 332 S.W.3d 395 (Tex. 2011), to argue that it would. There, the plaintiff was allowed to substitute the defendant's government employer as the named defendant even after limitations had run. *Id.* at 402. The plaintiffs misread *Bailey*.

*Bailey* is based on Texas Civil Practice & Remedies Code § 101.106(f), which the court stated (at the time) allowed suits brought under the Texas Tort Claims Act against employees in their official capacity to be considered a suit against the government employer. That is not so for § 1983 suits, which borrow only the general statute of limitations for personal injury suits. Indeed, *Bailey* goes on to say that without the statutorily required conversion of the claim into one against the government, such a suit would fail because "ordinarily, an amended pleading adding a new party does not relate back to the original pleading . . . . They did not misname or misidentify their defendant; they sued exactly whom they intended to sue." 332 S.W.3d at 400–01 (cleaned up).

So too here. The Texas law providing the statute of limitations does not allow relation back in this instance, so plaintiffs' claims against the additional defendants must also be dismissed as time-barred under Rule 15(c)(1)(a). We thus affirm the dismissal of the claims against Morelli and Arroyo.

*Claims Brought Under the TTCA & Due Process Claims*

Plaintiffs have not properly raised their TTCA or Due Process claims

No. 21-20337

on appeal or in their reply to defendants' response brief. *See United States v. Thibodeaux*, 211 F.3d 910, 912 (5th Cir. 2000). We therefore decline to address them here.

*Americans with Disabilities Act Claims*

The district court dismissed the claims against the city, Hayes, and Morelli for discrimination on the basis of mental health because "[t]he [ADA] does not apply to the police's response to people with mental disabilities before the scene is secured," and "Allen [gave] no legal support to the contrary." *See Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000).

On appeal, plaintiffs cite cases from other circuits that support a general right of action under the ADA for "(i) discrimination based on disparate treatment or impact, or (ii) denial of reasonable modifications or accommodations."[13] Even if plaintiffs were correct that other circuits would allow a claim against police officers—a proposition that is far from clear—the law in this circuit is unequivocal: The ADA "does not apply to an officer's on-the-street responses to . . . incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life." *Hainze*, 207 F.3d at 801. We thus affirm the dismissal of those claims.

## VII.

Plaintiffs request reassignment to a different district judge. We take judicial notice, however, that the current judge has taken senior status and has reassigned all of his pending cases; he will no longer be assigned this case on remand. *Amended Division of Work Order for 2023*, No. 2023-3 (S.D. Tex.

---

[13] *See, e.g., Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1086 (9th Cir. 2004); *Dunlap v. Ass'n of Bay Area Gov'ts*, 996 F. Supp. 962, 965 (N.D. Cal. 1998); *McGary v. City of Portland*, 386 F.3d 1259, 1265–66 (9th Cir. 2004).

No. 21-20337

Feb. 10, 2023).  The request is therefore denied as moot.

Plaintiffs have further alleged that the district court denied proper discovery.  Because the case was in the motion-to-dismiss posture, not in the summary judgment posture, these claims are of no moment.

\* \* \* \* \*

The claims of excessive force, unlawful arrest, and denial of medical care as brought against Hayes are REVERSED and REMANDED.  The dismissal of the remaining claims is AFFIRMED.  Plaintiffs' request for reassignment is DENIED as moot.  We intend no indication as to what actions the newly assigned district judge should take, or what decisions that judge should announce, on remand.